2012 COA 24

**SHAW CONSTRUCTION, LLC, Third–Party Plaintiff–Petitioner,**

v.

**UNITED BUILDER SERVICES, INC.; and MB Roofing, Inc., Third–Party Defendants–Respondents.**

No. 11CA2351.

Colorado Court of Appeals, Div. A.

Feb. 2, 2012.

Murphy Decker Hensen & Cook–Olson, P.C., C. Todd Drake, Michael J. Decker, Eric M. Kirby, Littleton, Colorado, for Third–Party Plaintiff–Petitioner.

Gifford Stevens, LLC, John H. Stevens, Amanda L. Tobey, Denver, Colorado, for Third–Party Defendant–Respondent United Builder Services, Inc.

Lasater & Martin, P.C., Janet B. Martin, Melissa Ogburn, Highlands Ranch, Colorado, for Third–Party Defendant–Respondent MB Roofing, Inc.

Opinion by Judge WEBB.

¶ 1 In this interlocutory appeal, we decide two questions of first impression under the Construction Defect Action Reform Act, sections 13–20–801, et seq., C.R.S.2011 ("CDARA"). First, section 13–20–805, C.R.S.2011 ("section 805"), tolls construction defect claims against only parties who receive actual notice of a claim. Second, in applying the statute of repose, section 13–80–104, C.R.S.2011 ("section 104"), to a multi-phase construction project, an improvement may be a discrete component of the larger project, which can be substantially completed before the entire project is finished. Therefore, we affirm the trial court's summary judgments for third-party defendants, United Builder Services, Inc. and MB Roofing, Inc. ("subcontractors"), and against third-party plaintiff-petitioner, Shaw Construction, LLC, on the basis that its claims were barred by the statute of repose.

## I. Facts and Procedural Background

¶ 2 Plaintiff, Roslyn Court at Stapleton Homeowners Association ("HOA"), which is not a party to this appeal, alleged construction defects in the Roslyn Court condominium complex, on which Shaw had been the general contractor. The project had been built in three phases. It included eighty residential units in thirty-three separate buildings, fifteen garage structures, and additional elements such as sidewalks, alleys, benches, courtyards, and landscaping.

¶ 3 Shaw hired United Builder Services to hang drywall and MB Roofing to install roofs, gutters, and downspouts. The City and County of Denver issued certificates of occupancy ("COs") for each residential building (between Sept. 24, 2003 and Oct. 28, 2003 for phase I; Oct. 31, 2003 and Jan. 29, 2004 for phase II; and Jan. 22, 2004 and March 10, 2004 for phase III). The CO for the last building in the project was issued on March 10, 2004. Subcontractors worked on this building. However, the project's architect did not certify completion of all known remaining architectural items in the project until June 8, 2004.

¶ 4 On May 15, 2007, Shaw received a notice of claim letter from the HOA under the CDARA. Following the statutory requirements, Shaw and the HOA attempted to resolve the claim without litigation. On January 21, 2009, the HOA filed this action against the developers of the property, but did not add Shaw as a defendant until January 28, 2010, when it amended its complaint to allege negligence, negligence per se, and breach of implied warranty of habitability against Shaw. On March 29, 2010, Shaw filed its answer and third-party complaint, naming subcontractors, among others, as third-party defendants. Shaw sent its only notice of claim under the CDARA to subcontractors the following day.

¶ 5 Subcontractors moved for summary judgment on the basis that the six-year stat-

ute of repose had run.[1] They argued that because substantial completion had occurred not later than the date the final CO was issued, March 10, 2004, the statute of repose barred Shaw's March 29, 2010, third-party complaint. Shaw responded that because substantial completion had not occurred until the architect certified completion on June 8, 2004, its third-party complaint was timely. However, Shaw failed to include in the summary judgment record any evidence that subcontractors' work continued after the date of the CO on the last building. Alternatively, Shaw argued that under section 805, the HOA's notice of claim had tolled all claims associated with the project, including those against subcontractors, although they had not received actual notice of the claim.

¶ 6 The trial court granted subcontractors' motions. Finding no disputed issues of material facts, the court concluded that substantial completion occurs "when an improvement to real property achieves a degree of completion at which the owner can conveniently utilize the improvement for the purpose it was intended." It further concluded that because the purpose of the project was "to provide a residence for occupants," the last CO indicated substantial completion of the project. The court rejected Shaw's argument that substantial completion occurred only once "all known remaining architectural items [had] been completed," noting that "completion of all known remaining architectural items goes beyond substantial completion." The court also rejected Shaw's tolling argument, holding that the plain language of the statute required actual notice to a party to toll a claim as to that party.

¶ 7 The trial court granted Shaw's motion for certification of the summary judgment orders under C.A.R. 4.2. We accepted the interlocutory appeal.

## II. Accepting the Petition

¶ 8 "[T]his court, in its discretion, 'may' order that an interlocutory appeal be heard." *Adams v. Corrections Corp. of America*, 264 P.3d 640, 643 (Colo.App.2011). No published decision under C.A.R. 4.2 and section 13–4–102.1, C.R.S.2011, has addressed the interlocutory appeal of an order dismissing a third-party complaint for indemnity, such as Shaw filed here.

¶ 9 The statute requires that the order involve "a controlling and unresolved question of law." Here, the questions of tolling and substantial completion, as discussed in sections V and VII below, are unresolved in Colorado. Shaw's view of either would require that the third-party claims be reinstated.

¶ 10 The statute also requires that appellate review "may promote a more orderly disposition or establish a final disposition of the litigation."[2] Because some of this language is similar to the federal interlocutory appeal statute, 28 U.S.C. § 1292(b) ("may materially advance the ultimate termination of the litigation"), federal authority can be informative. *Adams*, 264 P.3d at 643. However, use of the disjunctive "or" in our statute connotes an alternative. *See, e.g., Quintano v. People*, 105 P.3d 585, 591 (Colo.2005). Hence, because our statute is broader than its federal counterpart, we decline to follow cases such as *Allegheny Airlines, Inc. v. LeMay*, 448 F.2d 1341 (7th Cir.1971) (rejecting interlocutory appeal of third-party indemnity claim because success by primary defendant would moot those issues), cited in the dissent. Instead, we conclude that granting the petition here "may promote a more orderly disposition" of the litigation, for two reasons.

¶ 11 First, because potential liability of the third-party defendants would incent them to contribute to an overall settlement, appellate reinstatement of the third-party claims would increase the likelihood of a settlement. *See Joe Grasso & Son, Inc. v. United States*, 42 F.R.D. 329, 334 (S.D.Tex.1966) (immediate appellate resolution of third-party claim "could well result in settlement thereby eas-

---

1. United Builder Services and MB Roofing each moved separately for summary judgment, relying on the same arguments.

2. Because similar language does not appear in C.R.C.P. 54(b), we are unpersuaded by federal cases decided under substantially similar Fed. R.Civ.P. 54(b), cited by the dissent.

ing the Court's crowded docket"), *aff'd*, 380 F.2d 749 (5th Cir.1967).

¶ 12 Second, were Shaw to be found liable, later obtain reversal of the summary judgment for the subcontractors, and then try its indemnity claims against them, Shaw would have to present evidence of the alleged construction defects. However, Shaw could recover less than its liability established in the principal action if a second jury came to a different conclusion on the nature and extent of those defects, even though Shaw presented evidence similar to that in the first trial. Appellate reinstatement of the third-party claims precludes the risk of inconsistent verdicts. *See, e.g., Green v. Duke Power Co.*, 305 N.C. 603, 608, 290 S.E.2d 593, 596 (1982) (allowing an interlocutory appeal due to "the possibility that a party will be prejudiced by different juries in separate trials rendering inconsistent verdicts on the same factual issue").

### III. Standard of Review

¶ 13 We review de novo the trial court's summary judgment ruling. *Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 146 (Colo.2007). Summary judgment is appropriate only where the pleadings and supporting documents reveal no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *In re Tonko*, 154 P.3d 397, 402 (Colo.2007). The nonmoving party is entitled to the benefit of all favorable inferences reasonably drawn from the undisputed facts, and all doubts must be resolved against the moving party. *Martini v. Smith*, 42 P.3d 629, 632 (Colo.2002).

### IV. "Substantial Completion"— Question of Fact or Law

■ ¶ 14 Shaw's Petition for Interlocutory Appeal identifies as the first issue presented "Whether the determination of when substantial completion occurs [under the CDARA] is a question of fact for the trier of fact or a question of law for the court?" According to the trial court, "Whether an improvement to real property is 'substantially complete' is a question of law because it involves the interpretation of the terms of § 13–80–104(1)(a) and the application of this

statute to undisputed facts." We agree with the trial court, but for purposes of this opinion, amplify its statement as follows.

■ ¶ 15 First, Shaw correctly points out that the CDARA does not define "substantial completion." In 1986, an amendment removed the prior definition, "the degree of completion of an improvement to real property at which the owner can conveniently utilize the improvement for the purpose it was intended." § 13–80–127, C.R.S.1973; Ch. 114, sec. 1, § 13–80–104, 1986 Colo. Sess. Laws 697 (repealing former § 13–80–127). The legislative history does not explain the reason for this deletion. As with any question of statutory interpretation, review is de novo. *See, e.g., Apodaca v. Allstate Ins. Co.*, 255 P.3d 1099, 1103 (Colo.2011).

■ ¶ 16 Second, "[t]he interpretation of when a claim accrues under a statute of limitations is an issue of law." *Sulca v. Allstate Ins. Co.*, 77 P.3d 897, 899 (Colo.App. 2003). However, "[w]hether a statute of limitations bars a particular claim is a question of fact," although on undisputed facts it "may be decided as a matter of law." *Trigg v. State Farm Mut. Auto. Ins. Co.*, 129 P.3d 1099, 1101 (Colo.App.2005). We discern no reason to take a different approach to a statute of repose, nor have the parties cited any Colorado authority suggesting that we should do so.

¶ 17 Third, on appeal the parties have conflated the question of de novo review of the meaning of "substantial completion" with the question of whether Shaw has identified disputed issues of material fact that would preclude resolution by summary judgment. We review the meaning of "substantial completion" de novo. However, the parties do not identify any disputed factual issues as to tolling. And as indicated in Part VII below, we reject Shaw's assertion that it has identified any such issues concerning substantial completion.

### V. Tolling the Statute of Repose

■ ¶ 18 We next consider and reject Shaw's contention, identified in its Petition for Interlocutory Appeal as the third issue presented, that although it failed to give

subcontractors notice, its claims against them were tolled by the HOA's notice of claim to Shaw under section 805.

¶ 19 The CDARA was enacted to bring about "necessary and appropriate [changes in the law] concerning actions claiming damages, indemnity, or contribution in connection with alleged construction defects." § 13–20–802, C.R.S.2011. Section 805 states:

> If a notice of claim is sent to a construction professional in accordance with section 13–20–803.5 [3] within the time prescribed for the filing of an action under any applicable statute of limitations or repose, then the statute of limitations or repose is tolled until sixty days after the completion of the notice of claim process....

¶ 20 Shaw asserts that because section 805 does not require notice to every construction professional involved in a project, the first notice of claim tolls all construction defect claims arising from that project, including those against unnamed participants. We discern ambiguity in the statute, but reject this assertion as contrary to the legislative intent.

■■■ ¶ 21 Statutory interpretation is a matter of law to be reviewed de novo. *Spahmer v. Gullette*, 113 P.3d 158, 161 (Colo.2005). We must construe a statute to best effectuate the legislative intent, seeking first to give statutory provisions their plain and ordinary meanings. *Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1189 (Colo.2010). However, if a statute is "susceptible of more than one reasonable interpretation," *Dep't of Transp. v. Gypsum Ranch Co., LLC*, 244 P.3d 127, 131 (Colo.2010), we must look to other evidence of legislative intent, including "the object the legislature sought to obtain by the enactment, the circumstances under which it was adopted, and the consequences of a particular construction." *CLPF–Parkridge One, L.P. v. Harwell Invs., Inc.*, 105 P.3d 658, 661 (Colo.2005).

■■■ ¶ 22 In dealing with an ambiguous statute, we may refer to extraneous

sources, such as legislative history. *Jenkins v. Panama Canal Ry. Co.*, 208 P.3d 238, 241 (Colo.2009). Our interpretation must consider "the statutory scheme as a whole to give a consistent, harmonious, and sensible effect to all its parts." *Shelter Mut. Ins. Co. v. Mid–Century Ins. Co.*, 246 P.3d 651, 661 (Colo. 2011). And we presume the legislature intended a "just and reasonable result." *Anderson v. Longmont Toyota, Inc.*, 102 P.3d 323, 327 (Colo.2004).

¶ 23 Here, because section 805 does not say that claims against participants in the project without notice of a claim are tolled or that such claims are excluded from tolling, it could reasonably be interpreted to mean either. Hence, we consider whether Shaw's proposed interpretation would further the legislative intent behind the CDARA, and conclude that it would not.

■■■ ¶ 24 The General Assembly intended the CDARA to "streamlin[e] construction defect litigation." *CLPF–Parkridge One, L.P.*, 105 P.3d at 664. Historically, a construction professional who received a complaint responded by "cross-nam[ing] or add[ing] everybody and anybody who had any part to play in the construction chain." *Id.* The CDARA's sponsors sought to end this "shot gun" litigation approach by "limit[ing] who can be involved [to] the people that are responsible for the defect, so that only the subcontractors that are responsible for the defects will be entered into the action." *Id.* (internal quotation marks and citations omitted).[4]

¶ 25 To achieve this objective, the CDARA established procedures that facilitate out-of-court resolution of construction defect claims. A party wishing to bring a lawsuit against a construction professional must first send written notice describing the claim "in reasonable detail sufficient to determine the general nature of the defect." § 13–20–802.5(5), C.R.S.2011. The claimant must allow the construction professional to inspect the alleged defect within thirty days of ser-

---

**3.** Section 13–20–803.5, C.R.S.2011, outlines a mandatory notice of claim process discussed in more detail below.

**4.** The *CLPF–Parkridge One, L.P.* court derived its analysis of the CDARA's legislative history from transcripts of hearings on the proposed legislation before the House and Senate. 105 P.3d at 664.

vice of the notice of claim. § 13–20–803.5(2), C.R.S.2011. The construction professional then has thirty days after the inspection (or forty-five days in the case of commercial property) to make a written offer to remedy the defect or settle the claim, including a timetable for resolution. § 13–20–803.5(3). The action may proceed if: no offer is made; the claimant rejects the offer and no arrangements have been made for mediation; or the claimant accepts the offer but the construction professional fails to comply with its terms. § 13–20–803.5(6)–(7). Any action brought before complying with the notice of claim requirements will be stayed until those requirements have been completed. § 13–20–803.5(9).

¶ 26 Independently of the notice of claim process, the CDARA requires a claimant to file with the court and serve the construction professional with a list of the alleged construction defects. § 13–20–803, C.R.S.2011. The claimant must do so within sixty days after the action is brought, and the case may not go to trial until the claimant has done so. *Id.*

¶ 27 Looking to the overall context of this statutory scheme, we conclude that effectuating the CDARA's legislative intent does not require reading section 805 as tolling claims against parties who lack notice. Without notice, participants in the project would not take the steps set forth in the statute.

¶ 28 Further, both the notice of claim process and the list of defects provide the construction professional with sufficient information to identify which subcontractors are potentially responsible for the defect. This information eliminates a general contractor's need to notify every subcontractor involved in a project to preserve its own claims. Hence, tolling as to parties who lack notice is not necessary to avoid the shot gun approach condemned by the CDARA's sponsors.

¶ 29 In addition, the policy reasons behind a statute of repose weigh against Shaw's proposed interpretation, which would leave subcontractors exposed to claims after the six-year period of repose. Both statutes of limitation and statutes of repose discourage bringing "stale claims." *Lake Canal Reservoir Co. v. Beethe*, 227 P.3d 882, 886 (Colo.2010) (statute of limitations) (internal quotation marks and citation omitted); *Cornforth v. Larsen*, 49 P.3d 346, 348 (Colo.App. 2002) (statute of repose). But a statute of repose has the additional purpose of "reduc[ing] the so-called 'long tail' of liability created by the discovery rule," *Cornforth*, 49 P.3d at 348, through a bright line time bar after which a potential defendant is relieved of liability. In the present context, extending the statute of repose against parties without requiring that they receive notice of a claim could lead to unjust results because such parties might destroy records or cancel insurance in the belief that further claims against them were barred.[5]

¶ 30 Further, the 2003 amendments to the CDARA addressed general contractors preserving their claims against subcontractors by adding section 13–80–104(1)(b)(II):

Notwithstanding the provisions of paragraph (a) of this subsection (1),[6] all claims, including, but not limited to indemnity or contribution, by a claimant against a person who is or may be liable to the claimant for all or part of the claimant's liability to a third person:

(A) Arise at the time the third person's claim against the claimant is settled or at the time final judgment is entered on the third person's claim against the claimant, whichever comes first; and

(B) Shall be brought within ninety days after the claims arise, and not thereafter.

One of the bill's co-sponsors described this section as a "tolling provision," and the other noted:

It has a deferral of the statute of limitations on third party claims. Now it provides that the statute of limitations as it

---

5. In 1986, the General Assembly reduced the statute of repose from ten years to the present six or eight, suggesting the importance it places on relieving construction professionals from the "long tail of liability." *See* Ch. 114, sec. 1, § 13–80–104, 1986 Colo. Sess. Laws 697.

6. Section 13–80–104(1)(a) appears at the beginning of section IV below.

applies to builders is not triggered as to third party claims until court judgment is entered and settlement is reached.

*CLPF–Parkridge One, L.P.*, 105 P.3d at 664.

¶ 31 Insurance company representatives testified at the House hearings that this provision was intended to "provide a safety valve to avoid the prior practice of needlessly adding claims and parties to the construction defect litigation," by allowing contractors the choice to either add subcontractors as third parties in a pending action or bring a separate action against them for indemnity or contribution once the first claim is resolved. *Id.*

¶ 32 This testimony shows that the legislature was aware of general contractors' need to preserve their claims against subcontractors, which it addressed in section 13–80–104(1)(b)(II). Considering the statutory scheme as a whole, this section was the logical place to address tolling the statute of repose with regard to such claims, had the legislature desired to do so. However, by addressing when a general contractor's claim against third parties arises, the provision implicates only the statute of limitations. *See Two Denver Highlands Ltd. Liability Ltd. P'ship v. Stanley Structures, Inc.*, 12 P.3d 819, 821 (Colo.App.2000) ("A statute of limitations takes effect when a claim arises, while a statute of repose bars the bringing of a suit after a set period of time, regardless whether an injury has occurred or a claim has arisen."). Moreover, "[n]o testimony was presented that the amendments proposed by the CDARA were intended to alter the statute of repose." *Thermo Dev., Inc. v. Cent. Masonry Corp.*, 195 P.3d 1166, 1170 (Colo. App.2008).

¶ 33 Because we must presume that "the General Assembly's failure to include particular language is a statement of legislative intent," *Specialty Rests. Corp. v. Nelson*, 231 P.3d 393, 397 (Colo.2010), the failure to include the statute of repose in section 104 with regard to third-party claims reflects the legislature's intent not to extend it. We should not imply into section 805 what could have been directly expressed in section 104.

¶ 34 Therefore, we conclude that Shaw's claims against subcontractors were not tolled.

## VI.  Improvement to Real Property

¶ 35 We next consider and reject, based on the particular facts presented, Shaw's contention that its claims against subcontractors were raised within section 104's statute of repose because substantial completion did not occur until the architect's certificate was issued, identified as the second issue in its Petition for Interlocutory Appeal. In this regard, however, the record does not support the trial court's statement that "the parties do not dispute whether the statute of repose should be triggered at the completion of work by a single subcontractor or at the substantial completion of the entire project. Rather, the parties dispute when substantial completion of the entire project took place." Hence, we begin by considering what is the improvement as to which substantial completion should be determined.

> Section 104(1)(a) reads in pertinent part:
> Notwithstanding any statutory provision to the contrary, all actions against any architect, contractor, builder or builder vendor, engineer, or inspector performing or furnishing the design, planning, supervision, inspection, construction, or observation of construction of any improvement to real property shall be brought within the time provided in section 13–80–102 after the claim for relief arises, and not thereafter, but in no case shall an action be brought more than six years after the substantial completion of the improvement to the real property....

The CDARA does not define "improvement."

¶ 36 Shaw argues that in a multi-stage project, improvement means the entire project, but it cites no supporting authority. Subcontractors respond that the statute of repose is triggered "when the subcontractor completed its own work and not when the entire project was completed," citing *Homestake Enters., Inc. v. Oliver*, 817 P.2d 979, 984 (Colo.1991) (a sprinkler installed as part of a larger landscaping project constitutes an improvement), and *Stanske v. Wazee Elec. Co.*, 722 P.2d 402, 404–05 (Colo.1986) (an

indicator light installed as part of an electric auger system in a grain elevator constitutes an improvement).

¶ 37 These cases are not dispositive. In *Homestake*, neither party disputed that the sprinkler was an improvement, or that the injury at issue had taken place before the sprinkler was completed. In *Stanske*, the statute of repose had expired so long before the injury at issue that the court had no need to distinguish between completion of the indicator light and completion of the entire grain elevator electrical control system.

¶ 38 Here, we conclude that an improvement may be a discrete component of an entire project, such as the last of multiple residential buildings. Therefore, we need not resolve subcontractors' argument that an improvement should be determined even more narrowly on a trade-by-trade basis.

¶ 39 Whether an activity "constitute[s] the design and construction of an improvement to real property is a *question of law*, for it involves the interpretation of the terms of a statute and the application of that statute to known facts." *Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 641 (Colo.1988) (internal quotation marks and citation omitted; emphasis in original). Although Colorado cases purport to give the phrase "any improvement to real property" its ordinary meaning, *see, e.g., id.* at 640, no case either explains what that meaning is or cites definitional material.[7]

¶ 40 One quality of an improvement is permanence. *Anderson*, 766 P.2d at 641 (a conveyor system's "sheer size . . . suggests the lack of mobility which typically characterizes an ordinary improvement"). However, if the owner of the real property intends the construction to remain permanently, it constitutes an improvement even if it can be removed. *Enright v. City of Colo. Springs*, 716 P.2d 148, 150 (Colo.App.1985) (although glass vestibule added to building could be removed, because owner intended it to remain permanently, it constituted an improvement). Here, the permanence of the building on which the last CO issued is undisputed.

¶ 41 An improvement has also been described as "essential and integral to the function of the construction project." *Two Denver Highlands Ltd. P'ship v. Dillingham Constr. N.A., Inc.*, 932 P.2d 827, 829 (Colo. App.1996) (concrete poured as part of a parking garage constituted an improvement). Applying this definition, the division in *Highline Village Assocs. v. Hersh Cos.*, 996 P.2d 250, 254 (Colo.App.1999), *aff'd in part and rev'd in part on other grounds*, 30 P.3d 221 (Colo.2001), held that repainting the exteriors of two existing apartment complexes constituted an improvement. Here, the record does not show that the building on which the last CO issued was "essential and integral" to the overall project.

¶ 42 In previous statute of repose cases involving multi-phase construction projects, the statute had expired so long before the defect at issue became apparent that the courts did not need to distinguish between completion of a component and that of the overall project. Nevertheless, such cases suggest that an improvement can be a discrete component of a larger undertaking.

7. Out-of-state authority provides little guidance on this issue, as states have adopted a variety of differing approaches. *See, e.g., Adair v. Koppers Co., Inc.*, 741 F.2d 111, 115 (6th Cir.1984) (applying Ohio law) (applying a "common sense interpretation of 'improvement'" based on the definition from *Webster's Third International Dictionary*); *Noll by Noll v. Harrisburg Area YMCA*, 537 Pa. 274, 643 A.2d 81, 87–88 (1994) (holding that for an object to be an improvement, it must meet the common-law definition of a fixture); *Smith v. Westinghouse Elec. Corp.*, 732 P.2d 466, 470 (Okla.1987) (looking to ad valorem tax law to determine whether electrical equipment constituted an improvement). These cases often draw on express definitions of or tests for improvement not found in Colorado law. *See, e.g., Adair*, 741 F.2d at 114 ("In applying the definition of 'improvement,' courts consider whether a modification adds to the value of the property for the purposes of its intended use, as well as the nature of the improvement, its relationship to the land and its occupants, and its permanence." (internal quotation marks and citations omitted)); *Krull v. Thermogas Co. of Northwood, Iowa, Div. of Mapco Gas Prods., Inc.*, 522 N.W.2d 607, 612 (Iowa 1994) (a component constitutes an improvement if it "(1) enhanced the home's value, (2) involved the expenditure of labor or money, and (3) was designed to make the home more useful or valuable").

See, e.g., Anderson, 766 P.2d at 641 (installing a conveyor system as part of constructing a brick and tile plant); Stanske, 722 P.2d at 407 (installing an indicator light fixture as part of a grain elevator's electrical auger system); Embree v. American Continental Corp., 684 P.2d 951, 952 (Colo.App.1984) (grading a lot before constructing a home); see also McClanahan v. American Gilsonite Co., 494 F.Supp. 1334, 1340–42 (D.Colo.1980) (applying Colorado law to hold that a coking unit and surge tank, intermediate components of an oil refinery, constituted an improvement to real property).

¶ 43 The wording of section 104 also provides some support for this view. "When used as an adjective in a statute, the word 'any' means 'all.'" Stamp v. Vail Corp., 172 P.3d 437, 447 (Colo.2007). In contrast, "the definite article 'the' particularizes the subject which it precedes. It is a word of limitation." Brooks v. Zabka, 168 Colo. 265, 269, 450 P.2d 653, 655 (1969). Because section 104 first refers to "any improvement," followed by a reference to "the improvement," the language suggests that a construction professional could be involved in only one component of a larger product, which would be the focus of "substantial completion."

¶ 44 Moreover, use of "substantial" disfavors Shaw's view of improvement to mean the project as a whole. See Reynolds v. Armstead, 166 Colo. 372, 375, 443 P.2d 990, 991 (1968) ("substantial performance" of a contract entails "an attempt in good faith to strictly and fully perform ... [with] slight or inadvertent omissions or departures" (internal quotation marks and citation omitted)). In a multi-phase project consisting of numerous discrete components, determining when substantial completion occurs would be difficult. As the trial court recognized, the architect's letter on which Shaw relies certified total completion.

¶ 45 Here, the subcontractors worked on a discrete component—the final building—of the project. Drywall, roofs, gutters, and downspouts were integral and essential to the function of that building.

¶ 46 Accordingly, we conclude that the last building constituted an improvement, substantial completion of which would trigger the statute of repose.

## VII.   Substantial Completion

¶ 47 As framed by the parties and addressed by the trial court, the remaining issue is whether substantial completion should be determined on the basis of the date the final CO was issued on the last building or the date the architect certified project completion. However, we have decided the case on a different basis by concluding that the last building on which these subcontractors worked—as contrasted with the entire project—constituted an improvement for purposes of the statute of repose. Hence, we need not resolve whether substantial completion of an entire construction project occurs only when the architect certifies the project as complete.

¶ 48 The final CO shows that the units in the last building were habitable. City and County of Denver Building Code § 142.2 (2011) ("All new buildings or structures ... shall not be used or occupied until a Certificate of Occupancy is issued by the Building Official."); Denver Development Services, Certificate of Occupancy (2011), available at http://www.denvergov.org/development services/DevelopmentServices/Commercial Permits/CertificateofOccupancy/tabid/436821/ Default.aspx ("A Certificate of Occupancy provides official verification that the building is in full compliance with current building codes, and is safe for occupancy."). Moreover, the summary judgment record does not include evidence, nor did Shaw argue below, that these subcontractors continued to work on this building after the CO was issued.

¶ 49 Instead, Shaw explains—and the architect's certificate confirms—that the larger project included "exterior court yards, sidewalks, alleys, landscape features, [and] benches," which were not complete when the final CO issued. But Shaw does not argue, and the record does not suggest, that subcontractors were involved in these aspects of the project. Nor does the architect's letter indicate that further work by them delayed issuance of the completion certificate.

¶ 50 Therefore, we conclude that the statute of repose on claims against subcontractors began to run no later than March 10, 2004, when the CO on the last building was issued, and it barred Shaw's third-party complaint filed on March 29, 2010.[8]

¶ 51 The summary judgments are affirmed.

Judge CASEBOLT concurs.

Judge J. JONES concurs in part and dissents in part.

Judge J. JONES concurring in part and dissenting in part.

¶ 52 I concur in the conclusions reached by the majority on the merits of the issues presented in this interlocutory appeal. I also concur in the reasoning employed by the majority to reach those conclusions, except that I think it unnecessary to rely on the statements of legislative sponsors and committee witnesses in construing the CDARA.

¶ 53 I respectfully dissent, however, from the decision to accept this interlocutory appeal under C.A.R. 4.2. That rule allows the Court of Appeals to accept an appeal of an interlocutory order in a civil action, in its discretion. C.A.R. 4.2(a). One express requirement to accepting a petition requesting interlocutory appeal is that "immediate review may promote a more orderly disposition or establish a final disposition of the litigation. . . ." C.A.R. 4.2(b)(1).

¶ 54 Here, the plaintiff, the HOA, asserted claims against four defendants, one of which is Shaw. Shaw then asserted third-party claims against twelve third-party defendants, including subcontractors. All of Shaw's third-party claims are expressly contingent upon it being found liable to the HOA. Thus, a judgment in Shaw's favor on the HOA's claims against it will moot all of Shaw's third-party claims. And any decision we render on the third-party claims will not affect the HOA's claims against any defendant, including Shaw, either in terms of the merits or discovery.

¶ 55 Federal courts applying the federal counterpart to C.A.R. 4.2, 28 U.S.C. § 1292(b), have held that an interlocutory appeal should not be accepted where the claim at issue is a third-party claim which could be rendered moot by the resolution of other claims. See, e.g., Allegheny Airlines, Inc. v. LeMay, 448 F.2d 1341, 1342–43 (7th Cir.1971). Similarly, the federal courts have uniformly rejected certification under Fed. R.Civ.P. 54(b) of orders dismissing contingent third-party claims. See, e.g., Interstate Power Co. v. Kansas City Power & Light Co., 992 F.2d 804, 807–08 (8th Cir.1993); Corrosioneering, Inc. v. Thyssen Envtl. Sys., Inc., 807 F.2d 1279, 1284 (6th Cir.1986); U.S. Fire Ins. Co. v. Smith Barney, Harris Upham & Co., Inc., 724 F.2d 650, 652 (8th Cir.1983); Allegheny Airlines, 448 F.2d at 1342–43; Panichella v. Penn. R.R. Co., 252 F.2d 452, 455 (3d Cir.1958); see also Factory Mutual Ins. Co. v. Bobst Group USA, Inc., 392 F.3d 922, 924 (7th Cir.2004) (contingent counterclaim); United Bank of Kuwait PLC v. Enventure Energy Enhanced Oil Recovery Assocs., 763 F.Supp. 729, 731 (S.D.N.Y.1990) (one of several contingent claims).

¶ 56 These courts reason that where a contingent claim could be rendered moot by a decision on another claim, hearing an interlocutory appeal of a dismissal of the contingent claim is an inefficient use of judicial resources—that is, immediate review would not materially advance the ultimate resolution of the action.[1] The marginal utility, if any, of resolving the contingent claim in an interlocutory appeal is simply outweighed by the strong judicial interest in avoiding piecemeal appeals.

¶ 57 I do not perceive any significant benefit to hearing an interlocutory appeal of the

8. In light of the extensive briefing below, similarly thorough briefing on appeal, and the lack of significant disagreement among the parties over the record, we denied the requests for oral argument.

1. The majority dismisses my reliance on federal cases applying Fed.R.Civ.P. 54(b). But the reasoning employed by the courts in those cases exists apart from the rule. Whether the rule at issue is Fed.R.Civ.P. 54(b) or C.A.R. 4.2, the conclusions that accepting an interlocutory appeal of a dismissal of a contingent third-party claim is an inefficient use of judicial resources and will not *materially* advance the ultimate resolution of the case are equally applicable.

dismissal of the contingent third-party claims at issue. In my view, our decision will not promote a more orderly disposition of the case, and obviously will not establish a final disposition of the litigation.[2]

¶ 58 The majority concludes that a decision may promote a more orderly disposition of the case because it may promote a settlement and avoids a risk of inconsistent verdicts. I am not persuaded. The majority's settlement justification is pure speculation, and I am not at all sure that accepting or deciding an appeal out of a desire to promote settlement is a proper role of this court. The concern over potentially inconsistent verdicts could be alleviated, to some extent and perhaps entirely, by Shaw designating subcontractors as nonparties at fault under section 13–21–111.5, C.R.S.2011. I also note that the possibility of inconsistent verdicts was present in each of the federal cases cited above, yet those courts concluded that the possible mootness of any contingent third-party claims (a possibility here that the majority does not even acknowledge) and the policy disfavoring piecemeal appeals nonetheless counseled against accepting interlocutory appeals of orders dismissing contingent third-party claims. I do not agree with the majority's apparent conclusion that C.A.R. 4.2 and the related statute were intended to substantially undermine the historically strong policy against piecemeal appeals.

¶ 59 Therefore, though I concur in the judgment, I respectfully dissent from the decision to accept the appeal under C.A.R. 4.2.

---

**2.** It is also questionable whether an interlocutory appeal under C.A.R. 4.2 should be accepted where, as here, the effect of reversing the decision would be to add claims, and therefore complexity, to the litigation. *See Orson, Inc. v. Miramax Film Corp.*, 867 F.Supp. 319, 322 (E.D.Pa. 1994) (applying 28 U.S.C. § 1292(b)).